# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MICHAEL T. BENSON,<br><br>               Plaintiff,<br><br>v.<br><br>HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,<br><br>               Defendant. | **MEMORANDUM DECISION AND ORDER REGARDING DISCOVERY**<br><br>Case No. 2:10-cv-00275-TS<br><br>District Judge Ted Stewart<br><br>Magistrate Judge David Nuffer |

During scheduling, a conflict between the parties arose over whether discovery would be allowed in this ERISA case. The magistrate judge instructed the parties to brief the issue to prepare for the initial pretrial scheduling conference[1] which they did.[2] An order was issued;[3] an objection was filed and briefed;[4] the Tenth Circuit Court of Appeals issued an opinion in another case clarifying this area of the law;[5] the parties agreed[6] to supplemental briefing;[7]and the district

---

[1] Docket Text Order, docket no. 14, filed June 8, 2010 (ordering briefing).

[2] Plaintiff's Memorandum in Support of Limited Discovery (Supporting Memorandum 16), docket no. 16, filed July 2, 2010; Hartford's Memorandum of Law in Opposition to Benson's Request to Conduct Limited Discovery, docket no. 18, filed July 9, 2010 (Opposing Memorandum 18).

[3] Memorandum Decision and Order Regarding Discovery, docket no. 20, filed July 21, 2010.

[4] Hartford's Memorandum of Law in Support of its Objection to the Magistrate Judge's Order Regarding Discovery (Objection 24), docket no. 24, filed August 3, 2010; Plaintiff's Memorandum in Opposition to Hartford's Objection to Order Regarding Discovery (Benson's Opposition 27), docket no. 27, filed August 16, 2010.

[5] *Murphy v. Deloitte & Touche Group Ins. Plan*, 619 F.3d 1151 (10th Cir. 2010).

[6] Stipulated Motion for Supplemental Briefing, docket no. 32, filed September 16, 2010. *See also* Order for Supplemental Briefing, docket no. 33, filed September 17, 2010.

[7] [Benson's] Supplemental Brief, docket no. 34 (Benson's Brief 34), filed September 24, 2010; Hartford's Supplemental Brief Regarding Its Objection to the Magistrate Judge's Discovery Order (Hartford's Brief 35), docket no. 35, filed September 24, 2010; Hartford's Supplemental Reply Brief Regarding Its Objection to the Magistrate Judge's Discovery Order (Hartford's Reply 36), docket no. 36, filed October 1, 2010; [Benson's] Response to Defendant's Supplemental Brief (Benson's Response 37), docket no. 37, filed October 1, 2010.

judge remanded the issue back to the magistrate judge.[8]  The parties recently filed a stipulated motion to strike schedule[9] due to the inordinate time the magistrate judge has taken to enter this decision.

## Background

Michael T. Benson's late wife, Janice K. Benson (Kristy), worked for Zions Bancorporation (Zions).[10]  Zions offered its employees a disability insurance policy and a life insurance policy, both of which Kristy participated in.[11]  After Kristy became disabled, she began collecting from the disability insurance policy and in 2001 received a waiver of the premium on her life insurance policy due to her disabled status.[12]

Sometime before 2009, Hartford Life and Accident Insurance Company (Hartford) became both the insurer and administrator of the life insurance policy.[13]  In February 2009, Hartford cancelled the waiver of Kristy's life insurance premiums, claiming Kristy did not meet the definition of disability under that part of the life insurance plan.[14]  Kristy appealed the decision.[15]  In the appeal process, Hartford sent her claim to University Disability Consortium

---

[8] Memorandum Decision and Order Returning the Matter to the Magistrate Judge, docket no. 38, filed October 5, 2010.

[9] Stipulated Motion to Strike Scheduling Order, docket no. 39, filed January 13, 2011.

[10] Supporting Memorandum 16, at 3; Objection 24, at 2.

[11] Supporting Memorandum 16, at 3; Objection 24, at 2.

[12] Supporting Memorandum 16, at 3; Objection 24, at 2.

[13] Objection 24, at 2.

[14] Supporting Memorandum 16, at 3; Objection 24, at 3.

[15] Supporting Memorandum 16, at 3; Objection 24, at 3.

(UDC) for review.[16]  Two UDC physicians confirmed Hartford's decision that Kristy was not disabled for purposes of the life insurance premium waiver.[17]

In August 2009, Kristy passed away.[18]  Plaintiff filed a claim for his late wife's life insurance benefits, but Hartford responded by stating that Kristy did not have a life insurance policy at the time of her death, because of the termination of her premium waiver six months before, which had been affirmed only two months earlier.[19]  Plaintiff then filed this lawsuit.[20]

## Benson's Claims

Benson seeks reinstatement of the waiver of premium (thus reinstating Kristy's life insurance) and an award of attorney fees and costs.[21]  Benson's complaint claims that Hartford's decision was arbitrary and capricious because:

a.  Hartford relied on a paper on which her treating physician *checked a box* "indicating that Kristy was capable of performing part-time work that was 'medium'"[22] but did not credit a document she provided on appeal, "a more detailed 'Statement of Functionality' . . . in which [her treating physician] indicated that Kristy was not expected to return to work based on her diagnosis of COPD,"[23] and did not credit a second report her physician created at the request of Hartford that clearly indicated

---

[16] Supporting Memorandum 16, at 3; Objection 24, at 3.

[17] Supporting Memorandum 16, at 4; Objection 24, at 4.

[18] Supporting Memorandum 16, at 4.

[19] *Id.*

[20] *See* Complaint, docket no. 2, filed March 30, 2010.

[21] *Id.* at 7.

[22] *Id.* at 4.

[23] *Id.*

she was "prevented from performing any work, including part-time sedentary level work."[24]

    b.  Hartford did not consider that Kristy was receiving long term disability benefits and Social Security Disability benefits through the time of the appeal and until her death.[25]

    c.  Hartford's appeal review did not include any examination or inquiry of Kristy.[26]

Hartford's record includes reports from UDC which relate brief telephone conversations with Kristy's treating physician in May 2009 indicating she could work.[27] According to the bills for the UDC review, the time spent by UDC was less than three hours.[28] Benson points out that neither of the consultants at UDC examined Kristy. No one at Hartford examined her.

Benson also points to some documents in the administrative record which raise questions about the handling of Kristy's claim. One of these (Benson Rec 133) is a record of renewal of Kristy's premium waiver from 2002 to 2005. An undated post-it note on the document states "Zion's claims are handled differently as they paid the reserves so we'd take the claims. . . . In the past, we've gone ahead and renewed w/out all the info."[29] Another document (Benson Rec. 149) states "Hold final approval until Reserves rec'd."[30] Another document (Benson Rec. 31)

---

[24] *Id.*

[25] *Id.* at 5.

[26] *Id.*.

[27] *See* Exhibits E and F to Objection 24.

[28] Exhibit A to Hartford's Brief 35 at 2.

[29] Attached as Exhibit B to Supporting Memorandum 16.

[30] Attached as Exhibit B to Supporting Memorandum 16.

refs to two "diaries" - a "reduction diary" and a "term diary" – as well as "Case Management Special Provisions" none of which are in the administrative record.[31]

**Benson's Proposed Discovery**

Benson seeks discovery in four specific areas: "Hartford's general conflict of interest, the financial arrangements and relationship between Hartford and Zions Bancorp, the sponsor of Benson's plan, the relationship and financial arrangements between Hartford and UDC and statistical information about Hartford's claims processing and payment history."[32]

**Discovery in ERISA Cases Involving
Conflict of Interest and Procedural Irregularities**

When courts review the denial of benefits under an ERISA plan giving the administrator discretion, the very deferential "abuse of discretion" standard of review generally applies.[33]  In *Metropolitan Life Insurance Co. v. Glenn*,[34] the Supreme Court held that this deferential review standard applies even when a conflict of interest potentially affects the benefits decision.  This conflict arises when "a plan administrator both evaluates claims for benefits and pays benefits claims."[35]  In spite of the deferential review standard that may apply if a conflicted administrator has discretion, the Court said "the reviewing judge [is required] to take account of the conflict when determining whether the [plan administrator], substantively or procedurally, has abused his

---

[31] Attached as Exhibit C to Supporting Memorandum 16.

[32] Benson's Brief 34, at 5; Supporting Memorandum 16, at 9-10.

[33] *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008).

[34] *Id.* at 112.

[35] *Id.*

discretion."[36]  In the wake of *Glenn*, courts have struggled to determine what, if any discovery is appropriate in these sorts of ERISA cases to enable a judge to "take account of the conflict."[37]

The recent Tenth Circuit opinion in *Murphy v. Deloitte & Touche Group Ins. Plan*[38] gives much needed guidance to the trial courts regarding discovery in ERISA cases where an inherent dual role conflict of interest exists because a single entity both insures (pays claims) and administers a benefit plan.  The opinion clarifies prior cases and declares several standards which are summarized here with citations from the case.

- **Discovery is not allowed in ERISA cases on the issue of a claimant's eligibility.**

    As a starting point, we have frequently, consistently, and unequivocally reiterated that, in reviewing a plan administrator's decision under the arbitrary and capricious standard, the federal courts are limited to the administrative record.  Because we generally restrict district courts' review of an administrator's decision to the administrative record and because Federal Rule of Civil Procedure 26(b)(1) permits discovery only where it appears reasonably calculated to lead to the discovery of admissible evidence, extra-record discovery would generally seem inappropriate.[39]
    . . . .
    . . . [Tenth Circuit] case law prohibits courts from considering materials outside the administrative record where the extra-record materials sought to be introduced relate to a claimant's eligibility for benefits.[40]

- **In cases where a dual role conflict of interest[41] is alleged, some discovery may be needed for both sides to have necessary evidence of the *seriousness* of the conflict.**

    If an administrator operates under a dual role conflict of interest, the district court must always weigh the conflict of interest in its abuse of discretion

---

[36] *Id.* at 115..

[37] For a survey of the field after *Glenn*, see Elizabeth J. Bondurant, *Standard of Review and Discovery after Glenn: The Effect of the Glenn Standard of Review on the Role of Discovery in Cases Involving Conflicts of Interest*, 77 Def. Couns. J. 120, 124–32 (2010).

[38] *Murphy v. Deloitte & Touche Group Ins. Plan*, 619 F.3d 1151 (10th Cir. 2010).

[39] *Id.* at 1157 (citations and quotation marks omitted).

[40] *Id.* at 1162.

[41] The *Murphy* opinion also suggests discovery would be appropriate in cases involving procedural irregularities.  *Id.* at 1160.

analysis, but it must allocate the conflict more or less weight depending on its seriousness. But, without discovery, a claimant may not have access to the information necessary to establish the seriousness of the conflict. Similarly, the administrator may not be fully able to rebut a claim of conflict by showing that it has taken active steps to reduce potential bias and to promote accuracy . . . . [I]f the district court cannot consider material beyond the administrative record, it may not be able to fulfill its judicial task of allocating the proper weight to the conflict of interest.[42]

- **Discovery may be necessary to prove the probable effect of a conflict of interest.**

  [A claimant] might be able to argue that discovery, appropriately circumscribed, is appropriate to allow her to determine, and present evidence on . . . the likelihood that [the conflict of interest] jeopardized [the] decisionmaking process in her case.[43]

- **Discovery of claims administration practices may be proper, but review of the merits of other individual claims must be balanced against the utility of such discovery.**

  In *Glenn*, the Supreme Court explained that a conflict of interest weighs more heavily against an administrator where it has a history of biased claims administration. . . . Although the Supreme Court did not explicitly state that the district court could consider extra-record materials or that a claimant could discover extra-record materials, it must have contemplated that, at least in some cases, discovery and consideration of extra-record materials may be necessary and appropriate as an administrative record is not likely to contain the details of a history of biased administration of claims.[44]

  The magistrate judge was understandably concerned by the breadth of Ms. Murphy's discovery request, which sought extensive evidence of how the administrator and independent physicians had resolved other cases. We appreciate the magistrate judge's concern that this discovery could create a morass of secondary and remote arguments going to which other cases are comparable and relevant to showing prejudice or bias in this case. The utility of such expansive discovery is likely in all but the most unusual cases to be outweighed by the burdensomeness and costs involved. In any event, the

---

[42] *Id* at 1157-58 (citations and quotation marks omitted).

[43] *Id.* at 1164. The Murphy court notes that in *Wolberg v. AT & T Broadband Pension Plan*, "[it] explicitly criticized the plan participant for failing to seek discovery that could have proven the seriousness of the conflict of interest." *Id.* at 1160 (citing *Wolberg*, 123 Fed. Appx. 840, 846 n.3 (10th Cir. 2005) (unpublished)).

[44] *Id.* at 1161 (citations omitted).

balancing of these concerns will be vested in the sound discretion of the magistrate judge upon remand.[45]

- **"The party moving to supplement the record or engage in extra-record discovery bears the burden of showing its propriety."[46]**

- **No special rules should govern discovery in ERISA cases.**

  [In *Glenn*], the Supreme Court rejected other approaches to handling a dual role conflict, such as shifting to the administrator the burden of proving its decision is reasonable. *Glenn* explained that it was not "necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict."[47]
  . . . .
      . . . *Glenn's* admonition against special rules . . . also commands that we not create any special rules for discovery related to a dual role conflict of interest.[48]

- **Federal Rule of Civil Procedure 26(b) applies to ERISA discovery.**

  [W]e must apply Federal Rule of Civil Procedure 26(b) to discovery requests seeking information related to a dual role conflict of interest, just as we would apply that rule to other discovery requests.[49]

  Rule 26(b)(1) permits discovery only of "[r]elevant information" and the discovery must "appear[ ] reasonably calculated to lead to the discovery of admissible evidence." Moreover, all discovery is limited by Rule 26(b)(2), which protects against, *inter alia*, overly burdensome discovery requests, discovery of cumulative materials, and overly costly discovery requests.[50]

- **Several factors will militate against broad discovery.**

  - ***ERISA litigation must be speedy, inexpensive and efficient.***

    [S]everal factors . . . militate against broad discovery. First, while a district court must always bear in mind that ERISA seeks a fair and

---

[45] *Id.* at 1164 n.9 (citation omitted).

[46] *Id.* at 1163.

[47] *Id.* at 1162 (quoting *Glenn,* 554 U.S. at 116 (2008)) (citations omitted).

[48] *Id.* at 1162.

[49] *Id.*

[50] *Id.* at 1163.

informed resolution of claims, ERISA also seeks to ensure a speedy, inexpensive, and efficient resolution of those claims.[51]

[N]either a claimant nor an administrator should be allowed to use discovery to engage in unnecessarily broad discovery that slows the efficient resolution of an ERISA claim.[52]

- ***Adverse financial interest may often be obvious by the dual role.***

    [T]he benefit of allowing detailed discovery related to the administrator's financial interest in the claim will often be outweighed by its burdens and costs because the inherent dual role conflict makes that financial interest obvious . . . .[53]

- ***Evidence supporting claim denial may be so substantial that a conflict would not make a difference in the outcome.***

    [T]he substantive evidence supporting denial of a claim is so one-sided that the result would not change even giving full weight to the alleged conflict.[54]

- ***Thoroughness of the record (or lack thereof) may reveal that a conflict had no effect or that an alleged conflict is enough to warrant reversal.***

    [A] district court may be able to evaluate the effect of a conflict of interest on an administrator by examining the thoroughness of the administrator's review, which can be evaluated based on the administrative record. . . . [A] district court may allocate significant weight to a conflict of interest where the record reveals a lack of thoroughness.[55]

### Determining Allowable Discovery - Procedure

*Murphy* provides little procedural guidance. In the normal civil case, discovery is presumptively allowed. After discovery is promulgated, it is often refined by the practicality of a response, by the parties' negotiation or by court order. In this case, the dispute about *permitting*

---

[51] *Id.*

[52] *Id.* at 1162-63.

[53] *Id.* at 1163.

[54] *Id.*

[55] *Id.* at 1163-64.

discovery has evolved into *pre-approval* of discovery text. It is challenging for an ERISA plaintiff to explain the precise need for interrogatories and requests for production when the plaintiff is in possession of far less information than the defendant. As an example, it was only during this briefing that Benson became aware that Hartford did not administer or insure Kristy's long term disability benefit plan.[56] Without knowing the Tenth Circuit's view as to when a trial court should address propriety of discovery in an ERISA conflict case, the magistrate judge will take the issues now presented and decide what discovery, if any, is allowable, applying the *Murphy* principles.

Fortunately, the extended briefing in this case has permitted the parties to brief the need for discovery in light of the administrative record. Each has cited to the record to argue the need (or lack of need) for specific discovery.

### Application of *Murphy* Standards to this Case

Most of the principles from *Murphy* are readily applied to this case. First, no discovery of the issue of claim eligibility will be allowed. And Benson is not seeking discovery of or offering evidence of other sources of medical information outside the administrative record.

Second, this is not a case where the medical evidence in the record supports denial so clearly that discovery is not necessary as to the conflict of interest. The reports, written and verbal, from Kristy's treating physician, are conflicting. Ambiguity is also present because of the other disability ratings Kristy had, and because she died a mere two months after UDC found that she was able to work.

Third, the level of thoroughness of Hartford and UDC's inquiry as shown in the record does not suggest that the conflict of interest was plainly irrelevant. Apparently Hartford first

---

[56] Objection 24, at 1-2; Benson's Opposition 27, at 2.

relied on a single checkbox to terminate an eight-year premium waiver. And the UDC appeal was accomplished by two physicians, one spending 1.1 hours, and the other spending 1.8 hours, without an examination of Kristy, and without inquiry into her other disability evaluations for income payments and social security payments.

Fourth, while an adverse financial interest is obvious, and the conflicting roles Hartford had are acknowledged by both sides, that simple fact does not answer the questions about the *effect* and *seriousness* of that conflict. In fact, it is here that Benson offers interesting and unique support for his discovery requests about the relationship of Hartford and UDC, and fulfillment of Hartford's fiduciary role to plan members.

Benson's original memorandum seeking discovery attached a deposition transcript for Jonathan Peter Strang, M.D., the founder of UDC, who was deposed on February 10, 2006.[57] Benson offers the following from the Strang deposition:[58]

> UDC and The Hartford entered into a contractual relationship in 1992.[59]
>
> UDC has no other contract with any other insurance company.[60]
>
> Approximately 75% of UDC's overall revenue is derived from reviews of Hartford claims.[61]
>
> UDC's gross revenue increased between 50% to 100% from 2002 to 2004 after the contract between UDC and The Hartford was entered into.[62]
>
> UDC initially charged $300.00 per hour for its physicians' reviews of Hartford disability claims, but it[s] charge under the 2002 contract between UDC and The Hartford was reduced to $225 per hour based on a "volume discount type arrangement."[63]

---

[57] Supporting Memorandum 16, at 11-12. The deposition was taken in the case of *McMahon v. Continental Casualty Co.*, Case No. C-05-01292 CRB (N.D. Cal.).

[58] Supporting Memorandum 16, at 12-13.

[59] Strang Deposition at 30.

[60] *Id.* at 30-31.

[61] *Id.* at 32-33.

[62] *Id.* at 171-72.

In connection with the reduction of the per claim fee, Hartford represented to UDC that it would provide 200 to 250 claims for review per month.[64]

UDC maintains internal guidelines regarding preparation of reports and what information to include and exclude in those reports.[65]

UDC does not perform any in-person examinations of The Hartford's claimants. The reviews conducted by UDC medical reviewers are of medical records only.[66]

As instructed by The Hartford, UDC discards all written documentation in connection with claim reviews after 6 months.[67]

### Fed. R. Civ. P. 26(b)

The other *Murphy* factors relate to the standard constraints of Rule 26(b), in light of the concern that ERISA litigation must be speedy, inexpensive and efficient. In this examination, *Murphy's* mandate against "special rules" must be remembered. And just as *Murphy* took *Glenn's* counsel "against special procedural and evidentiary rules . . . to apply also to discovery rules,"[68] this court will take that counsel to treat this case just as any other civil case when analyzing permissibility of discovery. Discoverability is not admissibility. Pre-service examination of discovery requests is highly unusual, so the magistrate judge will attempt to examine the proposed discovery (which has been thoroughly briefed[69] in light of *Murphy*) as if a motion to compel and protective order were pending. That said, there may be further objections or clarifications needed as often happens in the course of propounding and answering discovery.

---

[63] *Id.* at 39.

[64] *Id.* at 41.

[65] *Id.* at 93.

[66] *Id.* at 120.

[67] *Id.* at 149-50.

[68] *Murphy*, 619 F.3d at 1162.

[69] Benson's Brief 34; Hartford's Brief 35; Hartford's Reply 36; Benson's Response 37.

Some of this discovery may lead to information which *could* be used for an attempt to re-evaluate Kristy's eligibility. But her eligibility is not before this court. Discovery should not be prohibited because evidence obtained may have a dual purpose if *one* of those purposes is present in this case. Some dual-content information might be so confusing or have so little bearing on the conflict of interest and procedural irregularities in this case that it might be excluded in a hearing or bench trial, but at this stage, we are making discovery decisions.

### Interrogatories[70]

Interrogatory No. 1 simply requests **identification of persons** answering the discovery.[71] Hartford objected that this interrogatory has "no relevance to conflict of interest" and is "cumulative of information in the administrative record."[72] That objection is probably directed to the next two, and as to this interrogatory, it is overruled.

Interrogatories 2, 3 and 4 seek the identities of persons involved in the benefits denial decision and in medical evaluation of Kristy's claim.[73] Hartford objects because "[t]he

---

[70] The proposed interrogatories are attached as Exhibit A to Supporting Memorandum 16.

[71]    INTERROGATORY NO. 1:  Identify each person making and assisting you with your Interrogatory responses, including each person's name, age, address, occupation, current title and relationship to Hartford or related entity.

[72] Hartford's Brief 35, at 5.

[73]    INTERROGATORY NO. 2:  Identify the specific person, or if a committee, the names of committee members, who was or were responsible for the decision to deny benefits to the Plaintiff under the Plan in this case at each level at which the case was considered or appealed, and for each person, provide the person's title, length of employment with Hartford or any of its related entities, and professional qualifications.

INTERROGATORY NO. 3:  For each individual identified in response to Interrogatory No. 2, identify the rate of pay, bonuses paid, awards or other indices of recognition for job performance for the entire time period since the person was first employed by Hartford or any of its related entities.

INTERROGATORY NO. 4:  Please state the names of each and every person who provided any medical analysis, evaluation, consultation, opinion, or advice at the behest of Hartford, related in any manner to the Plaintiff's claim in this case; and for each such individual, state their employer, job title, length of employment with Hartford or any of its related entities, and for the time period since the person was first employed, the rate of pay, bonuses paid, awards or other indices of

administrative record documents the names and titles of persons who participated in the claim decision at issue" and because of lack of relevance and seeking cumulative information.[74] Unfortunately some of the documents which Benson has referenced as significant have no signature or author identification. Benson Rec 133 has only initials on the principal page and no identifiers on the unclear post-it note. Benson Rec 149 has no indication of authorship. While the critical denial letter of February 20, 2009 is attributed to Jaclyn Nemcik, it repeatedly speaks in the plural: "we consider;" "We will, however, allow you;" "Once we receive your appeal, we will again review." When stating the action on behalf of the company, the letter uses this mode: "The Harford has determined . . . ."[75] Identities are unclear throughout these few documents the parties have offered for consideration. The disclosure of identities should "lead to the discovery of admissible evidence."[76] Hartford's objections are overruled.

Associated with identity is basic role information such as "the person's title, length of employment . . . and professional qualifications" sought in Interrogatories 2 and 4. This information will verify Hartford's compliance with ERISA regulations which require that an insurer issuing a denial of benefits:

> (iii) Provide that, in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, . . . the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment; (iv) Provide for the identification of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination.[77]

---

recognition for job performance; if such a person was paid under any status other than that of an employee, please fully explain how such individual was paid.

[74] Hartford's Brief 35 at 5.

[75] Exhibit C to Objection 24.

[76] Fed R. Civ. P. 26(b)(1).

[77] 29 C.F.R. § 2560.503-1(h)(3)(iii) to (iv) (2010).

These interrogatories 2-4 seek to know more about those persons who are identified in the record and those persons whose notes are in the record, but who are not identified in the record; and will also reveal the identities of persons who were consulted, but whose advice was disregarded and therefore not reflected in the record.

These interrogatories also ask for compensation information such as "the rate of pay, bonuses paid, awards or other indices of recognition for job performance; if such a person was paid under any status other than that of an employee, please fully explain how such individual was paid." *Glenn* suggests that structural safeguards or the lack thereof may be relevant in evaluating the weight to give a conflict of interest. Whether an "administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits"[78] is a pertinent area for inquiry. *Murphy* also notes that "the extent to which the administrator has insulated its decisionmaking process from its financial interest may not be obvious."[79] *Murphy* gives one example of a structural safeguard meriting discovery: "For example, discovery related to how an administrator structures its compensation for the independent physicians that reviewed a plan participant's claim might be appropriate to determine if the administrator took steps to insulate the independent reviewers from the administrator's obvious financial interest."[80] Similarly, if pay incentivizes denial, that would be very pertinent to the ultimate analysis in this case, making discovery appropriate.

---

[78] *Glenn* at 117.

[79] *Murphy* 1163 n.7.

[80] *Id.*

The interrogatories relating to the **unclear terms in the Administrative Record** are necessary just to understand these critical documents. These include Interrogatories 7, 8 and 9 which ask about "blocks of waivers" and various diaries and other records which were apparently not produced in the Administrative Record.[81] As written, these interrogatories are not "overly burdensome," "cumulative," or "overly costly."[82]

Another issue not clear but apparently of significance is that some claims (and related reserves) were still associated with the employer, Zions Bancorporation, and the statement in the record that "Zion's claims are handled differently."[83] Interrogatories 5, 6 and 9 (again) appear to reach these issues.[84] While the facts of *Murphy* did not extend to this issue, *Murphy* implies that it is also attempting to clarify the law applicable to discovery in cases involving "procedural irregularities."[85] Understanding these terms is essential to understanding the procedures followed and whether the procedures were "regular."

---

[81] INTERROGATORY NO. 7: Describe with particularity the policies and procedures in existence for Hartford at the time it received the "block of waivers" identified at AR p. "Benson Rec. 000020."

INTERROGATORY NO. 8: Identify and describe with particularity the meaning of, and policies and procedures in existence for Hartford in connection with, the terms "reduction diary," "term diary" and "Case Management Special Provisions" identified at AR p. "Benson Rec. 000031.

INTERROGATORY NO. 9: Identify and describe the policies and procedures in existence for Hartford in connection with the "Zions claims" identified at AR p. "Benson Rec. 000133."

[82] *Murphy*, 619 F.3d at 1163.

[83] Benson Rec. 133 attached as Exhibit B to Supporting Memorandum 16.

[84] INTERROGATORY NO. 5: Please state the source of funding for any benefits that would have been paid to the Plaintiff had the Plaintiff been found eligible for benefits under the Plan, and if the Plaintiff had been or is found to be entitled to benefits.

INTERROGATORY NO. 6: Please describe with particularity the financial relationship between Hartford and Zions with respect to the administration, interpretation and funding of the Plan, including without limitation in your answer, any financial impact on Zions when Hartford must pay claims under the Policy and/or when Hartford provides a waiver of premium for life insurance benefits.

[85] *See Murphy*, 619 F.3d at 1157, 1160.

Because the **nature and extent of Hartford's interest as payor** cannot be understood without understanding the "reserves" referenced (without explanation) as a matter of concern in the Administrative Record, interrogatories 5 (again), 9 (again), 10, and 11 are appropriate.[86] The record states that the decision on Kristy's claim was related to these reserves, but the nature of this relationship and its effect on the decision-making process is not clear and needs to be elucidated.

Interrogatories 18, 19, and 20 continue the inquiry into Hartford's procedures.[87] ERISA regulations require plans and insurers to "establish and maintain reasonable claims procedures."[88] Those procedures must "contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants."[89] The regulations also provide that

---

[86]     INTERROGATORY NO. 10: Identify and describe the nature of the "reserves" identified at AR p. "Benson Rec. 000149" including, but not limited to the source of the reserves and the purpose of the reserves.

        INTERROGATORY NO. 11: State the amount in dollars of the reserve assigned to Kristy's life and disability claims, the name and titles of the individuals involved in setting the reserve amounts, each individual's actions or responsibilities in setting the reserves and identify all criteria or guidelines used by Hartford in determining the reserve amounts.

[87]     INTERROGATORY NO. 18:  Please identify any and all internal guidelines, policies, procedures, claims handling manuals and memorandum in existence during the time this claim was considered, either on initial application or on further appeal(s), concerning the interpretation and/or administration of the policy issued in this case that are not contained in the record provided to the Plaintiff's counsel.

        INTERROGATORY NO. 19:  Please identify any and all internal guidelines, policies, procedures, claims handling manuals and memorandum in existence during the time frame at issue in this case concerning the interpretation and/or administration of a claim for waiver of benefits on a life insurance policy which is contingent on a claimant being disabled where the claimant is also receiving long term disability benefits under a Hartford group disability insurance policy.

        INTERROGATORY NO. 20:  Please identify any and all internal guidelines, policies, procedures, claims handling manuals and memorandum in existence during the time frame at issue in this case concerning the interpretation and/or administration of a claim submitted under an ERISA-governed plan as opposed to a non-ERISA plan.

[88] 29 C.F.R. § 2560.503-1(b).

[89] 29 C.F.R. § 2560.503-1(b)(5).

part of "a full and fair review of the claim and the adverse benefit determination"[90] is access to "all documents, records, and other information relevant to the claimant's claim for benefits."[91]

Interrogatory 18 requests identification of all documentation governing the administration of the life insurance benefit plan. This encompasses a great deal of information not relevant to the waiver of premium issue present in this case. What is needed are all the documents governing processing of Kristy's waiver of premium claim that are not in the Administrative Record.

Interrogatory 19 is more specific, in asking for all documents governing a disability waiver of premium on a life insurance policy when the insured is receiving disability income benefits. Benson proposed to amend Interrogatory 19 because during briefing Benson became aware that Hartford was not Kristy's long term disability insurer.[92]

The excessive breadth of Interrogatory 18 and the needed amendment of Interrogatory 19 can be remedied by striking Interrogatory 18 and redrafting Interrogatory 19 as follows:

> INTERROGATORY NO. 19: Please identify any and all internal guidelines, policies, procedures, claims handling manuals and memorandum in existence during the time frame at issue in this case concerning the interpretation and/or administration of a claim for waiver of <u>premium</u> benefits on a life insurance policy <u>including (without limitation) a waiver</u> which is contingent on a claimant being disabled<u>, and including (without limitation) circumstances</u> where the claimant is also receiving long term disability benefits under a <s>Hartford</s> group disability insurance policy.

Interrogatory 20 seeks information on comparative practices for handling claims under ERISA plans and similar non-ERISA plans. Benson claims this interrogatory "relates directly to ERISA's claims processing regulations that require ERISA plans to put in place safeguards to

---

[90] 29 C.F.R. § 2560.503-1(h)(1).

[91] 29 C.F.R. § 2560.503-1(h)(2)(iii).

[92] Benson's Response 37, at 5 n.1.

ensure that ERISA plans treat similarly situated participants and beneficiaries in like fashion."[93] However, this regulation speaks of similar situations in the *ERISA regulated* plan and says nothing about comparative practices under plans outside ERISA regulation. This interrogatory is stricken.

Interrogatories 12-17 deal with the functions of UDC as a reviewer of Hartford's decision to stop Kristy's waiver of premium. Because of Hartford's dual role conflict of interest as payor and administrator necessitates discovery, Hartford's delegation of the important review function deserves scrutiny as well.

Interrogatories 12-15 seek broad statistical information regarding UDC's relationship with Hartford.[94] The information is simple, straightforward and general: the number of medical reviews UDC performed for Hartford annually since 2005, the results granting or denying benefits, and the fees received (gross and average – presumably the gross divided by the number of reviews). Hartford objects that this discovery violates *Murphy's* warning "that discovery about independent physicians' handling of third party claims 'could create a morass of secondary and remote arguments going to which other cases are comparable and relevant to showing prejudice or bias in [a] case.'"[95] Nothing in this interrogatory seeks information on specific

---

[93] Benson's Response 37, at 5 (citing 29 C.F.R. § 2560.503-1(b)(5)).

[94] INTERROGATORY NO. 12: Identify the number of medical reviews performed by University Disability Consortium ("UDC") physicians or psychologists at the request of HARTFORD for each of the years 2005 through the present.

INTERROGATORY NO. 13: Of the reviews performed by UDC physicians or psychologists at the request of HARTFORD, describe how many reviews have resulted in a finding of "not disabled" or a denial of benefits.

INTERROGATORY NO. 14: Describe the average fee earned by UDC and/or its individual reviewing physicians or psychologists for a medical review completed for Hartford.

INTERROGATORY NO. 15: For each of the years from 2005 to the present, provide the total gross monetary compensation paid to UDC and/or its individual physicians or psychologists by Hartford.

[95] Hartford's Brief 35, at 6 (citing and quoting *Murphy*, 619 F.3d at 1164 n.9).

cases. And, as Hartford admits, "[t]he Tenth Circuit noted that discovery about 'how an administrator structures its compensation for the independent physicians that reviewed a plan participant's claim might be appropriate.'"[96] The broad, general, non-case specific information sought here will be helpful in understanding the interests of UDC and the intentions of Hartford in appointing and compensating UDC. This information is not duplicative of the Administrative Record, as Hartford objects.[97] The documents in the record only deal with the billing in this case. And that is not enough to understand how Hartford structures its compensation in its relationship with UDC.

Interrogatories 16 and 17[98] are specific to the two reviewers who appear of record in Kristy's case. Similarly to the general information about UDC's relationship with Hartford, these interrogatories seek non-case specific information and (since it appears from the Strang deposition a majority of UDC's income is from Hartford) it should not be too burdensome to state "the total number of reviews performed per year and the gross monetary compensation paid" to each of the UDC reviewers who participated in Kristy's claim.

<h3 style="text-align:center">Requests for Production[99]</h3>

The requests for production of documents follow a pattern similar to the interrogatories. The same considerations that made some of the interrogatories acceptable or unacceptable govern here.

---

[96] Hartford's Brief 35, at 6 (citing and quoting *Murphy*, 619 F.3d at 1163 n.7).

[97] Hartford's Brief 35 at 6-7.

[98] INTERROGATORY NO. 16: For each of the years from 2005 to the present, provide the total number of reviews performed per year and the gross monetary compensation paid to Dr. Georgette Chekiri by Hartford for those reviews.

INTERROGATORY NO. 17: For each of the years from 2005 to the present, provide the total number of reviews performed per year and the gross monetary compensation paid to Dr. Maureen Smith Ruffell by Hartford for those reviews.

[99] The proposed requests for production are attached as Exhibit A to the Supporting Memorandum 16.

Request No. 1[100] seeking documents referenced in preparing interrogatory answers is similar to Interrogatory 1 seeking the names of persons who participated in preparing the answers. It is proper.

The relationship of Zions and Hartford and their interests in the reserves affected the handling of Kristy's claim, but that relationship and its effect are not understood. Therefore, Request No. 2 is appropriate.[101] It needs to be amended, however, to strike the inquiry into the transfer of responsibility "from UNUM to Hartford for long term disability benefits," since briefing has revealed that never happened.

Because Benson is entitled to know the terms under which Kristy's claim was handled, Request No. 3 seeking plan documents is appropriate.[102] It should be limited, though, to documents relating to the waiver of premium issue. Of course, many general plan documents will embrace that subject without specific mention of waiver of premium and should be produced in their entirety, but directives, guides and memoranda solely discussing payment of life insurance benefits would not be discoverable under the request as revised.

> REQUEST NO. 3: Produce any and all documents outlining the duties and responsibilities of Hartford and the plan administrator/employer in connection with administration of the Plan <u>which affect waiver of premium</u>, processing claims for <u>waiver of premium</u> benefits under the Plan, considering appeals of denials of <u>waiver of premium</u> benefits under the Plan and which identify the individual(s) or entities with discretion to determine eligibility for <u>waiver of premium</u> benefits under the Plan.

---

[100] REQUEST NO. 1: Produce each and every document identified or relied on in preparing your responses to the Interrogatories above.

[101] REQUEST NO. 2: Produce each and every document in connection with the transfer of Zions' employees benefits from UNUM to Hartford for long term disability benefits or from Beneficial to Hartford for life insurance benefits including, but not limited to, contracts, insurance policies, plan documents, administrative agreements, payments of premium, and payments of funds for "reserves" or other purposes.

[102] REQUEST NO. 3: Produce any and all documents outlining the duties and responsibilities of Hartford and the plan administrator/employer in connection with administration of the Plan, processing claims for benefits under the Plan, considering appeals of denials of benefits under the Plan and which identify the individual(s) or entities with discretion to determine eligibility for benefits under the Plan.

Clarification of undefined terms, which figured in the documentation of Kristy's claim, is very important. For that reason, Request No. 4 is appropriate.[103]

The qualification of persons who rendered medical opinions on Kristy's claim is relevant under ERISA regulations and not apparent in the Administrative Record. It may also be that not all medical opinions received are contained in the record. If there are no such excluded opinions the request is easy to answer. Request No. 5 is appropriate.[104] This request is not aimed at (and the information received may not be used for) re-evaluation of Kristy's eligibility but it is important support for evaluation of the process as full, fair and regular.

At least as the magistrate judge understands the structure of Hartford and the intent of Request No. 3, Requests Nos. 6 and 7 are duplicative and overbroad.[105] "Documents," as used in Request No. 3, should include "claims manuals, instructional and training documents" and "procedures, guidelines, and instructions." The duties of "employees/claims processors" and "claims adjusters" correspond to the duties and responsibilities of Hartford, which are addressed in Request No. 3. Request No. 3 has been appropriately limited to the subject matter of "waiver of premium." Requests Nos. 6 and 7 are stricken.

---

[103]  REQUEST NO. 4:  Produce any and all documents, in whatever form, relating to the "reduction diary," the "term diary" and "Case Management Special Provisions" referenced in Kristy's file materials.

[104]  REQUEST NO. 5:  Produce any and all medical opinions, reports, memoranda, emails, correspondence and/or any other documents reflecting a review of Plaintiff's claim by a person or persons with medical expertise, including each individual reviewer's credentials and *curriculum vitae*, in connection with the denials of coverage during the appeal process for Plaintiff's claim.

[105]  REQUEST NO. 6:  Produce any and all claims manuals, procedures, guidelines, instructions, training materials and/or any other documents utilized by Hartford employees/claims processors in processing a claim submitted by:  participants or beneficiaries in an ERISA-governed plan; and participants or beneficiaries in a non-ERISA plan.

REQUEST NO. 7:  Produce all claims manuals, instructional and training documents available to Hartford's claims adjusters from 2005 through the present.

Request No. 8 makes two inquiries.[106]  It seeks information about "Hartford's relationship with UDC."  The request for 1099 documentation is consistent with and will verify the income stated in the interrogatory answers.  The request for instructions and correspondence with the UDC reviewers is limited to this case and ensures that the Administrative Record is complete.  The request is appropriate.

## Deposition

Benson's original filing on the issue of discovery "reserves the right to request a Rule 30(b)(6) deposition to further explore the conflict of interest issue if necessary."[107]  To avoid the parties' further briefing in this carefully examined case, and because the normal considerations of Rule 26(b) govern, Benson has leave, after completion of written discovery, to notice 30(b)(6) depositions of Hartford and of UDC.

## ORDER

IT IS HEREBY ORDERED that Benson may proceed with the proposed discovery as modified by this order and that the parties shall submit a proposed schedule within fourteen days.

Dated January 28, 2011.

BY THE COURT:

David Nuffer
U.S. Magistrate Judge

---

[106]    REQUEST NO. 8:  Produce the following documents pertaining to Hartford's relationship with UDC from 2005 to the present:  a. IRS 1099 form(s) regarding compensation paid by Hartford to UDC and/or its individual reviewers; b. Instructions provided by Hartford or UDC to Dr. Georgette Chekiri or Dr. Maureen Smith Ruffell concerning writing reports concerning insurance claimants; c. Correspondence between Hartford and UDC and/or its individual reviewing physicians concerning the Plaintiff's claim.

[107] Supporting Memorandum 16, at 14.